# Illinois Official Reports

## Appellate Court

---

### *In re L.K.*, 2019 IL App (1st) 163156

---

| | |
|---|---|
| Appellate Court Caption | *In re L.K.*, a Person Found Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. L.K., Respondent-Appellant). |
| District & No. | First District, Third Division<br>No. 1-16-3156 |
| Filed | November 27, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-COMH-3259; the Hon. Margarita Kulys-Hoffman, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Veronique Baker and Ann Krasuski, of Illinois Guardianship & Advocacy Commission, of Hines, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People. |
| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion.<br>Presiding Justice Ellis and Justice Cobbs concurred in the judgment and opinion. |

¶ 1 In September 2016, the State filed a petition for the involuntary admission of respondent, L.K., on an inpatient basis to a mental health facility. The statutory basis alleged in the petition for respondent's involuntary admission was that a mental illness rendered respondent unable to provide for his basic physical needs. At the trial of the petition, the State's expert witness did not opine that respondent was unable to provide for his basic physical needs, as alleged in the petition. Instead, the State's expert testified that, due to mental illness, respondent was expected to cause physical harm to himself or another, which is a different statutory basis for involuntary admission that was not alleged in the petition. The trial court found respondent subject to involuntary admission because he is unable to provide for his basic physical needs and because he is expected to cause physical harm to himself or another.

¶ 2 For the following reasons, we reverse.

## I. BACKGROUND

¶ 4 The petition filed in this case is a form petition that gave the petitioner the option to allege that (1) respondent is "a person with mental illness who: because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harmed" or (2) respondent is "a person with mental illness who: because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or others, unless treated on an inpatient basis" and that respondent was "in need of immediate hospitalization for the prevention of harm." The form petition filed in this case checked off only the second option: that respondent was unable to provide for his own basic needs. The petition asked for the basis of the assertion about respondent. The petition against respondent states as the basis, "non-compliance with treatment and unwilling to provide collateral information."

¶ 5 The petition states that a "Certificate of Examination" is attached to the petition. A document titled "Inpatient Certificate" is attached and states that a psychiatrist examined respondent at Mt. Sinai Hospital. The Inpatient Certificate is also a form certificate and provides an option for the examiner to state that, based on his or her examination, the examinee is "[a] person with mental illness who, because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harmed." That option is not checked on respondent's Inpatient Certificate. The option checked on the Inpatient Certificate of respondent's examination states that, based on the examination, the examiner is of the opinion that respondent is

"[a] person with mental illness who, because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself form serious harm, without the assistance of family or others, unless treated on an inpatient basis; a person with mental illness who: refuses treatment or is not adhering adequately to prescribed treatment; because of the nature of his or her illness is unable to understand his or her need for treatment; and if not treated on an inpatient basis, is reasonably expected based on his or her behavioral history, to suffer mental or emotional deterioration and is

reasonably expected, after such deterioration to meet the criteria of either paragraph one or paragraph two above."

(The option that was checked was "paragraph two.") The Inpatient Certificate also has the box checked that reads respondent "[i]s in need of immediate hospitalization for the prevention of such harm." The Inpatient Certificate states that the examiner based her opinion on a diagnosis of schizophrenia and that respondent was very paranoid, with poor reality testing; exhibited poor self-care; was easily agitated; was unable to care for himself; and could not guard himself from harm.

¶ 6 The record contains a second Inpatient Certificate of an examination of respondent conducted on the same day as the examination referenced in the Inpatient Certificate attached to the petition. According to the Inpatient Certificates, the examination referenced in the Inpatient Certificate attached to the petition occurred at 11:33 a.m., and the examination referenced in the second Inpatient Certificate in the record occurred on the same day at 8 p.m. (20:00 hours). The second examination was conducted by a different psychiatrist and occurred at Madden Mental Health Center, which is the facility to which respondent was admitted. The second Inpatient Certificate states that, based on an examination of respondent, it was the examiner's opinion that respondent was:

"A person with mental illness who, because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harm; [and]

A person with mental illness who: refused treatment or is not adhering adequately to prescribed treatment; because of the nature of his or her illness is unable to understand his or her need for treatment; and if not treated on an inpatient basis, is reasonably expected based on his or her behavioral history, to suffer mental or emotional deterioration and is reasonably expected, after such deterioration, to meet the criteria of either paragraph one or paragraph two above; [and]

is in need of immediate hospitalization for the prevention of such harm."

The second Inpatient Certificate states that the second psychiatrist's opinion was based on a finding that "patient is psychotic, mute, non-cooperative, cannot take care of himself."

¶ 7 The petition to involuntarily admit respondent proceeded to a trial. Respondent represented himself at that trial. The State called respondent's father and Dr. Gabriel Valdes to testify. Dr. Valdes testified as an expert in psychiatry. Respondent was Dr. Valdes's patient at Madden. Dr. Valdes testified he tried to engage respondent three times per week but he had "yet to have a conversation with him because he often times just does not respond to any of my questions or inquiries." Dr. Valdes's opinion, based on a reasonable degree of psychiatric certainty, was that respondent suffered from schizophrenia and that respondent was then currently symptomatic. Dr. Valdes testified that, based on his conversations with respondent's father, respondent may have begun suffering from schizophrenia as early as a year before the trial. Dr. Valdes testified that around that time respondent "began to experience symptoms of delusions and paranoia."

¶ 8 Dr. Valdes testified that this was respondent's first hospitalization that he was aware of. The doctor noted that the previous prescription of psychotropic medication led to the assumption that respondent may have been diagnosed with a major mental illness. The State

asked Dr. Valdes how respondent's symptoms supported the diagnosis of schizophrenia. Dr. Valdes answered that respondent was

> "showing a lot of negative symptoms of schizophrenia with social withdraw; catatonic behavior where he assumes postures for extended periods of time, where he does not move at all; selective mutism where he does not respond to questions when prodded. There's also a great deal of avoidance, and some of it can be easily interpreted as paranoia where he just simply avoids people or any kind of observations from people or any observation directed at him from people as a result of concerns that *** people may be trying to harm him in some way."

Dr. Valdes testified that much of his evaluation had been based on respondent's behavior. Dr. Valdes observed that respondent's behavior indicated there was some symptomology going on, including that any time Dr. Valdes saw respondent outside of his room, respondent was covering his face. Respondent covered his face even when eating, such that "you don't actually see him putting food in his mouth." Also, whenever Dr. Valdes saw respondent in his room, respondent was "covered from head to toe assuming a fetal-like position *** and does not respond in any kind of way; and also does not seem to move at all, not even twitch, in response to any questions." Dr. Valdes testified that respondent had not been able to express his thoughts to him.

¶ 9 Dr. Valdes testified that it was his opinion, to a reasonable degree of psychiatric certainty, that, because of respondent's mental illness, respondent was reasonably expected to engage in conduct placing himself or another in physical harm or a reasonable expectation of physical harm unless respondent was treated on an inpatient basis. Dr. Valdes testified that respondent had been refusing treatment "on many different levels." He explained that respondent had refused medication and "other interventions that are considered routine on the unit." For example, respondent had "showered maybe once weekly, despite strong encouragement by staff to maintain his hygiene. And as far as his food intake, [respondent had] increased his caloric intake since he has been in the hospital, but at first he would only eat about half of what he was given." Dr. Valdes testified that respondent is not able to understand his need for medication. He testified that, if not treated on an inpatient basis, respondent will suffer the mental or emotional deterioration that had been occurring for the prior year or longer. In an unstructured setting, there is a reasonable expectation respondent would misinterpret other people's behaviors or intentions and respond in an aggressive manner.

¶ 10 Dr. Valdes testified that it was his recommendation that respondent continue inpatient hospitalization. When asked if less restrictive alternatives had been explored, Dr. Valdes testified they had been explored but they would be inappropriate for respondent, based on his mental condition at the time, because respondent

> "refused to *** perform basic functions, and he shows a great deal of abolition or lack of initiative, which would put him at a detriment in terms of him being able to provide for some of his basic needs, again, in a less structured setting where basic things may be provided for him."

¶ 11 On cross-examination, respondent, acting *pro se*, asked Dr. Valdes if he would say that respondent was "normal right now or would you say I'm symptomatic." Dr. Valdes answered that respondent at that point was symptomatic. The symptoms of schizophrenia that Dr. Valdes testified respondent was showing during his cross-examination were poor insight and poor judgment. Dr. Valdes testified respondent showed those symptoms in

- 4 -

"the way you are essentially failing to acknowledge some of the behavior that came before; and the fact that you are failing to acknowledge the fact that the behavior that we have been engaging in with each other and you with other staff on the unit throughout the time that you have been in the hospital, that you are not able to address that as having been abnormal."

Respondent asked Dr. Valdes if respondent's behavior was "abnormal right now?" Dr. Valdes answered, "As we are speaking right now, you're saying? No, at this point [you] are not showing necessarily acute abnormal behavior." Respondent asked Dr. Valdes to explain his testimony that respondent was symptomatic at the time. Dr. Valdes testified he was only seeing a snapshot and that a full evaluation was needed to determine if respondent was "able to engage in the way that normal people would be able to," but at that very moment, respondent was not conducting himself in a way that was acutely disorganized.

¶ 12   Respondent asked Dr. Valdes whether he would say that respondent was lacking as far as providing for his own basic needs. Dr. Valdes testified "*I'm not sure that that's necessarily one of the things that we are trying to imply here*. It's more of a threat to others." (Emphasis added.) Respondent asked, "Oh, okay. So you don't think that I have a problem providing my basic needs?" Dr. Valdes answered, "*I think you can probably manage on your own, yes*." (Emphasis added.) Respondent asked Dr. Valdes what symptoms of schizophrenia respondent had. Dr. Valdes testified he had established that respondent displayed "negative symptoms" of schizophrenia, that based on respondent's behavior he was likely suffering delusions of persecution, and that Dr. Valdes had established respondent had disorganized behavior, which was most likely indicative of disorganized thinking.

¶ 13   On redirect examination, Dr. Valdes was asked to explain how respondent's behavior in court could be different from Dr. Valdes's observations of respondent while in the medical unit. Dr. Valdes testified "certain symptoms can be controlled for short periods of time." Dr. Valdes testified they sometimes allow patients to remain in the unit for as long as they need to "until we are able to establish a firmer diagnosis." Dr. Valdes testified they had been able to do that with respondent "because he has been there for a long time." Respondent's behavior had consistently shown "symptoms of negative symptomatology," and his "behavior has been diagnosed to the point that it shows dysfunctionality." Dr. Valdes testified that in his observations of respondent over an eight-hour period, respondent spends seven hours of the day "lying in bed covered from head to toe with his blanket."

¶ 14   After the trial, the trial court orally ruled that the State had met its burden. The court stated:
"I think there is evidence that the Respondent is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another person in physical harm or in reasonable expectation of being physically harmed; and unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or other."
The court stated it was going to grant the petition and order respondent hospitalized in the Department of Human Services mental health center for a period not to exceed 90 days.

¶ 15   The trial court entered a written order finding:
"That the Respondent is subject to involuntary admission on an inpatient basis because in accordance with Section 1-119 of the Mental Health and Disabilities Code, he or she is a person with mental illness and who because of that mental illness is:

1. Reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harmed.

2. Unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or others unless treated on an inpatient basis.

3. A person with mental illness who (i) refuses treatment or is not adhering to prescribed treatment; (ii) because of the nature of his or her illness, is unable to understand his or her need for treatment; and (iii) if not treated on an inpatient basis, is reasonably expected, based on his or her behavioral history, to suffer mental or emotional deterioration and is reasonably expected, after such deterioration, to meet the criteria of paragraph (1) or (2) above."

¶ 16    This appeal followed.

## II. ANALYSIS

¶ 18    The first issue we must address is whether respondent's appeal should be dismissed as moot. "An appeal is moot if it involves no actual controversy or the reviewing court cannot grant the complaining party effectual relief." *Deutsche Bank National Trust Co. v. Roman*, 2019 IL App (1st) 171296, ¶ 21. The State's position is that, due to the expiration of the involuntary admission order, the case is moot because this court can no longer grant respondent any meaningful relief and no exception to the mootness doctrine applies. Respondent conceded the involuntary admission order was entered for a period of 90 days, which have expired, and thus the case is moot. See *In re Maureen D.*, 2015 IL App (1st) 141517, ¶ 20 (and cases cited therein). Nonetheless respondent argues the case falls within the "public interest" and "collateral consequences" exceptions to the mootness doctrine.

¶ 19    The public interest exception "permits review of an otherwise moot appeal when three requirements are met: (1) the question presented must be public rather than case-specific in nature; (2) an authoritative determination is needed to guide public officers in future cases; and (3) there is a likelihood the issue will recur." *In re Linda B.*, 2017 IL 119392, ¶ 19. "The collateral consequences exception to mootness allows for appellate review, even though a court order *** has ceased, because a plaintiff has suffered, or [is] threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." (Internal quotation marks omitted.) *In re Alfred H.H.*, 233 Ill. 2d 345, 361 (2009). Application of the collateral consequences exception "requires *** that continuing 'collateral consequences' *** be either proved or presumed." (Internal quotation marks omitted.) *Id.* Additionally, "[c]ollateral consequences must be identified that could stem solely from the present adjudication." (Internal quotation marks omitted.) *In re Rita P.*, 2014 IL 115798, ¶ 34.

¶ 20    This court has jurisdiction over an appeal that is moot if it falls within any one of the recognized exceptions to the mootness doctrine. See *In re H.P.*, 2019 IL App (5th) 150302, ¶ 15; see also *In re Beverly B.*, 2017 IL App (2d) 160327, ¶ 19 ("Because the order at issue here has expired and because we do not generally decide moot questions, we must consider the extent to which respondent's claims fall under *any* exception to the mootness doctrine before we may address the merits of her claims." (Emphasis added.)). A "specific appeal of a mental health case will usually fall within one of the established exceptions to the mootness doctrine." *In re Alfred H.H.*, 233 Ill. 2d at 355. However, "there is no *per se* exception to mootness that

universally applies to mental health cases." *Id.* "Whether an appeal should be dismissed as moot presents a question of law, which we review *de novo.*" *In re Linda B.*, 2015 IL App (1st) 132134, ¶ 11.

¶ 21 Respondent argues that the collateral consequences exception applies because "the order here could affect [respondent] adversely in his efforts to obtain employment if it is not reversed." Specifically, respondent argues he could be precluded from obtaining certain professional licenses. Respondent also relies upon the decision in *Alfred H.H.*, in which our supreme court recognized that "the collateral consequences exception to the mootness doctrine is applicable in mental health cases and has been recognized by a host of Illinois court opinions, including opinions of this court." *In re Alfred H.H.*, 233 Ill. 2d at 361-62. The court noted "there are a host of potential legal benefits to *** a reversal" of an adjudication as a person subject to involuntary admission to a mental health facility, including that "the reversal could affect the ability of a respondent to seek employment in certain fields." *Id.* at 362. The court cautioned, however, that the application of the collateral consequences exception "is still decided on a case-by-case basis." *Id.*

¶ 22 In this case, the State argues that the collateral consequences exception does not apply because the same restrictions on respondent's ability to pursue certain professional careers stemming from his involuntary commitment would also result from a subsequent order for the involuntary administration of psychotropic medication, which respondent did not appeal. That order is not contained in the record on appeal. Rather, the State included the order in the appendix to its brief. Respondent moved to strike the document from the State's brief on the grounds that (1) the State failed to redact respondent's name from the document in violation of section 11(vi) of the Mental Health and Developmental Disabilities Confidentiality Act (Act) (740 ILCS 110/11(vi) (West 2018)) and Illinois Supreme Court Rule 364(c)(5) (eff. July 1, 2017) and (2) the State appended the order to its brief without citing authority, seeking leave from this court, filing a motion to supplement the record, or asking this court to take judicial notice. This court ordered respondent's motion to be taken with this case.

¶ 23 Illinois Supreme Court Rule 341(f) (eff. May 25, 2018) reads, in pertinent part, as follows:

"In all appeals involving juveniles filed from proceedings under the Juvenile Court Act or the Adoption Act, and in all appeals under the Mental Health and Developmental Disabilities Code, the Mental Health and Developmental Disabilities Confidentiality Act, or from actions for collection of fees for mental health services, the respective juvenile or recipient of mental-health services shall be identified by first name and last initial or by initials only.

The preferred method is the first name and last initial. The alternative method of initials only is to be used when, due to an unusual first name or spelling, the preferred method would create a substantial risk of revealing the individual's identity. The name of the involved juvenile or recipient of services shall not appear in the brief."

Next, Rule 364(c)(5) reads, in pertinent part, as follows:

"[I]n appeals filed from proceedings referenced in Rule 341(f), rather than redaction, the respective juvenile or recipient of mental health services shall be identified by first name and last initial, except that initials only shall be used when, due to an unusual first name or spelling, using the first name and last initial would create a substantial risk of revealing the individual's identity." Ill. S. Ct. R. 364(c)(5) (eff. July 1, 2017).

¶ 24    The State failed to redact respondent's name from the "Order for Administration of Authorized Involuntary Treatment" attached to its brief. Moreover, this court has consistently held that the record on appeal cannot be supplemented by attaching documents to the appendix of a brief. See, *e.g.*, *Marzouki v. Najar-Marzouki*, 2014 IL App (1st) 132841, ¶ 20. Respondent's motion to strike is granted. The order contained in the appendix to the State's brief will be disregarded. See *Allstate Insurance Co. v. Kovar*, 363 Ill. App. 3d 493, 499 (2006). The State's brief will be placed under seal to protect respondent's identity.

¶ 25    Regardless of the striking of the order for medication, respondent argues that "an order for medication does not carry the same collateral consequences as a commitment order." Specifically, there is no evidence that the medication order included an order to notify the Illinois State Police that respondent was subject to involuntary admission. Moreover, a medication order carries different implications than a commitment order in that "a commitment order stems in part from the State's police authority to protect society from dangerous persons," while a medication order "stems solely from the State's *parens patriae* power to care for its residents." Respondent also asserts that the reversal of a commitment order invalidates a medication order. In *In re John N.*, 364 Ill. App. 3d 996, 997 (2006), the trial court found the respondent subject to involuntary admission and later also found the respondent subject to involuntary administration of psychotropic medication. The court noted that pursuant to statute, "a court may authorize administration of involuntary treatment to a 'recipient of services.' [Citation.]" *Id.* at 998. The court concluded that "the circuit court's order [for medication] was dependent upon the respondent currently receiving treatment as an inpatient at a mental health facility." *Id.* The court held that because it "reversed the order concerning the respondent's involuntary admission, he will no longer be receiving *** treatment at the mental health facility and therefore no longer qualifies as a 'recipient of services' for involuntary administration of medication." *Id.*; see also 405 ILCS 5/2-107.1(a-5) (West 2018) ("psychotropic medication *** may be administered to an adult recipient of services on an inpatient or outpatient basis without the informed consent of the recipient"); *In re Carol B.*, 2017 IL App (4th) 160604, ¶ 67 ("[B]ecause we have reversed the trial court's involuntary-admission order, [the] respondent no longer qualifies as a '[r]ecipient of services' for the administration of involuntary treatment *** [citation]. [Citation.] We therefore also reverse the court's involuntary-medication order.").

¶ 26    In this case, we similarly find that any order for medication arose from the involuntary admission. Despite the lack of a current appeal, respondent could seek to invalidate the order for medication based on an order invalidating the order for involuntary admission. *Cf. People v. Madison*, 2014 IL App (1st) 131950, ¶ 16 (because finding that the respondent was unfit to stand trial "will remain regardless of the outcome of this appeal, it is unclear how resolution of the issues [the respondent] raises could alleviate any of the claimed collateral consequences she identifies"). Here, to the extent respondent's "consequences" arise from the order from medication, as the State argues, respondent is "threatened with an actual injury" traceable to the order for admission that is "likely to be redressed by a favorable decision" in this case. See *In re Alfred H.H.*, 233 Ill. 2d at 361. Moreover, respondent has not relied upon "vague unsupported statements that collateral consequences might plague [him] in the future." *In re Deborah S.*, 2015 IL App (1st) 123596, ¶ 23 (citing *In re Rita P.*, 2014 IL 115798, ¶¶ 33-34). Respondent has pointed to specific concerns related to licensure in professions, which the record supports finding respondent has pursued. See *id.* ¶ 25 ("respondent's ability to seek

employment similar to that she has held in the past would be negatively impacted by the involuntary admission order"). Accordingly, for all the foregoing reasons, we find, "based on a case-by-case analysis of the particular facts and circumstances of this case, the collateral consequences exception applies here and we will address the merits of [respondent's] substantive arguments." *Id.*

¶ 27    Substantively, respondent argues that the order must be reversed because the petition in this case alleged respondent was unable to provide for his basic physical needs, but the State failed to offer any evidence in support of that allegation. Instead, the State attempted to prove that respondent was reasonably expected to place himself or another in physical harm, which was not alleged in the petition.

¶ 28    In its response brief, the State concedes "it was error for the trial court to find respondent subject to involuntary commitment based on theories that were not alleged in the petition." See *In re Joseph S.*, 339 Ill. App. 3d 599, 606-07 (2003) ("It is reversible error when the pleadings allege one of the two statutory bases for involuntary admission but the arguments at trial and the findings relate solely to the other basis; they are distinct, and one cannot plead one cause of action but prove another." (citing *In re Moore*, 292 Ill. App. 3d 1069, 1071-72 (1997))). Nonetheless, the State argues that the evidence was sufficient to prove the allegation in the petition that respondent was unable to provide for his basic needs. The State admits it never asked Dr. Valdes specifically if respondent could provide for his basic needs but argues that viewing the evidence in a light most favorable to the State, the trial court's finding that respondent is unable to provide for his basic physical needs is not against the manifest weight of the evidence. See *In re Hannah E.*, 376 Ill. App. 3d 648, 661 (2007) ("The standard of review for an involuntary commitment proceeding is whether the judgment is against the manifest weight of the evidence. [Citations.] The trial court's decision is afforded great deference, particularly because it is in a superior position to see the witnesses, hear their testimony, determine their credibility and weigh the evidence. [Citations.] Absent a showing that it is against the manifest weight of the evidence, the trial court's decision will not be set aside, even if the reviewing court would have ruled differently.").

¶ 29    Respondent, citing *In re Shirley M.*, 368 Ill. App. 3d 1187, 1194 (2006), asserts the State was required to elicit explicit medical testimony in support of the petition, and he argues that in this case the record contains no factual evidence and no expert opinion that respondent could not care for his basic physical needs. In *Shirley M.*, the court wrote: "Expert opinion regarding mental illness and inability to guard oneself from harm must be in the form of explicit medical testimony, based upon a clear and convincing factual basis." (Internal quotation marks omitted.) *Id.*

    "A showing of the need for involuntary mental health treatment must be based upon explicit medical testimony. *In re Cochran*, 139 Ill. App. 3d 198, 200, 487 N.E.2d 389, 391 (1985). 'Both the facts upon which the medical opinion is based and the medical testimony upon which the decision *** is based must be established by clear and convincing evidence.' *In re Cochran*, 139 Ill. App. 3d at 200, 487 N.E.2d at 391, citing *People v. Sansone*, 18 Ill. App. 3d 315, 326, 309 N.E.2d 733, 741 (1974)." *In re Phillip E.*, 385 Ill. App. 3d 278, 284 (2008).

See also *In re Alaka W.*, 379 Ill. App. 3d 251, 267-68 (2008). In *Alaka W.*, the court held as follows:

"Even if [the respondent's] behavior does indicate a mental illness, 'a finding of mental illness alone cannot sustain an order requiring commitment to a mental hospital for treatment.' [Citation.] Instead, '[t]o support an order of commitment for treatment, the State *** must submit an explicit medical opinion asserting that as a direct result of such mental illness, the person presently is unable to care for his physical well-being. Additionally, the medical opinion must be based upon direct observation of the person's conduct.' " *Id.* at 268 (quoting *In re Love*, 48 Ill. App. 3d 517, 520 (1977)).

¶ 30     This case is distinguishable from *In re Joseph S.*, in which this court held that, despite the fact the trial court erred in allegedly finding the respondent subject to involuntary admission based on a statutory basis not alleged in the petition (that he was a danger to himself or others), reversal was not required where there was sufficient evidence to sustain the trial court's finding of the alternate statutory basis that was alleged in the petition (that he was unable to provide for his basic physical needs). *In re Joseph S.*, 339 Ill. App. 3d at 606-07. In *Joseph S.*, the State's expert witness discussed the alternate statutory basis (that the respondent was unable to provide for his basis physical needs) "at length." *Id.* at 607. The expert in that case expressly "stated that [the] respondent was unable to take care of his basic physical needs due to his delusional thinking causing him to misinterpret reality." *Id.* at 603. Thus, the *Joseph S.* court held "the State here sought and received a finding by the court that respondent was unable to care for his physical needs," and accordingly, the statutory basis that was alleged in the petition was "argued at the hearing and found by the trial court." *Id.* at 607. In this case, the State does not point to explicit medical opinion testimony that respondent was unable to care for his basic physical needs, nor do we find any such testimony in the record. Indeed, when respondent asked the expert on cross-examination whether respondent could provide for his basic needs, the expert stated, "*I think you can probably manage on your own, yes*." The State admits it "never asked Dr. Valdes specifically if respondent could care for his basic needs. Accordingly, based on the foregoing authorities, we must find that the State failed to meet its burden to prove respondent was unable to provide for his basic physical needs. As this was the sole basis alleged in the petition for his involuntary admission to a mental health facility, the trial court's order is reversed.

¶ 31                                          III. CONCLUSION
¶ 32     For the foregoing reasons, the circuit court of Cook County is reversed.

¶ 33     Reversed.